## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-CR-30024 |
| | ) | |
| BELINDA YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED MOTION FOR COMPASSIONATE RELEASE

Defendant Belinda Young, through her attorney Assistant
Federal Public Defender Rosana E. Brown, hereby moves this
Honorable Court for compassionate release pursuant to 18 U.S.C.
§ 3582(c)(1)(A) and The CARES Act, Pub. L. No. 116-136 (Mar. 27,
2020).  In support thereof, she provides the following:

## I.    Introduction

This Court sentenced Ms. Young on October 9, 2015, to serve
120 months' imprisonment, to be followed by a 8-year term of
supervised release, pursuant to her guilty plea to one count of
Conspiracy to Distribute 5 or More Kilograms of Cocaine, in
violation of 21 U.S.C. § 841(b)(1)(A).  Ms. Young has remained in

custody since August 5, 2014.  Her currently projected release date
is October 11, 2022.

Ms. Young is a 58-year old woman serving her sentence with
the Bureau of Prisons (BOP) location at FCI Pekin.  Ms. Young
suffers from blood clots in her legs and lungs which require that
she take daily medications for blood thinning to reduce her risk of
pulmonary embolism.  In addition, she suffered a heart attack in
2013 after which she was hospitalized at St. John's Hospital in
Springfield.  PSR at ¶ 119.  Together with her age, these chronic
medical conditions may place Ms. Young at high risk for contracting
and having serious complications, including death, from COVID-
19.[1]  While the BOP facility at which she is house, FCI Pekin,
currently has no confirmed positive cases of COVID-19,
compassionate release is ultimately a discretionary issue best left to
the Court's purview.  Thus, she proposes that her health
conditions, age, and minimal time left to her sentence, coupled with
circumstances created by the current pandemic warrant the

---

[1] *People Who are at Higher Risk from Severe Illness*, CDC (Mar. 18, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-
complications.html.

exercise of this Court's discretion in considering her release to an early period of home confinement.

As of June 25, 2020, 89 Bureau of Prisons inmates and 1 staff member have died from COVID-19, and the death toll continues to rise.[2]  This risk is not confined to the elderly—58% of now-deceased inmates, like Ms. Young, were under the age of 65.[3]  Eighty-one (81) of those now-deceased inmates, like Ms. Young, had "pre-existing medical conditions which the CDC lists as risk factors for developing more severe COVID-19 disease."[4]  Eight of those now-deceased inmates had no pre-existing conditions at all.[5]

On Friday, April 3, 2020, Attorney General William Barr issued a memorandum expanding availability of home confinement as an alternative to incarceration finding that emergency conditions due to the COVID-19 pandemic "are materially affecting the functioning of the Bureau of Prisons."[6]  Legal experts have implored

---

[2] https://www.bop.gov/coronavirus/.

[3] An analysis of BOP Press Releases per death shows that 52 of 89 inmate deaths were individuals under the age of 65. https://www.bop.gov/resources/press_releases.jsp.

[4] *Id.*

[5] *Id.* (looking to press releases void of statements alleging the inmate suffered from pre-existing health conditions).

[6] Memorandum from the Attorney General, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2019), at https://www.justice.gov/file/1266661/download.

the Attorney General to expand the home confinement program even further.[7]  BOP's response after the Barr Memorandum has been sparse and non-transparent.[8]  In recent weeks, multiple United States Senators have voiced concern over BOP's flailing attempts to curb the spread of the virus, and their non-responsiveness to the call to release medically vulnerable inmates.[9]

Ms. Young is currently housed at FCI Pekin.  While there are not yet any confirmed cases in that particular facility, the virus infiltrates new facilities daily and has expanded at an alarming rate

---

[7] Brennan Center for Justice letter to Att'y Gen. William P. Barr, *Expanding BOP's Response to the Novel Coronavirus, and Helping States Safely Reduce their Prison Populations* (Apr. 16, 2020), at https://www.brennancenter.org/sites/default/files/2020-04/BC%20Letter%20to%20DOJ%20final_0.pdf.

[8] Forbes, *Lack of Direction from Bureau of Prisons Showing in Federal Court* (Apr. 21, 2020) (describing a lack of guidance to BOP facilities, changes in posture concerning eligibility, and court confusion in general), https://www.forbes.com/sites/walterpavlo/2020/04/21/lack-of-direction-from-bureau-of-prisons-showing-in-federal-court/#74e400a411fe.

[9] Jessica Ladd, *Senator Discusses COVID-19 Threat at Federal Prisons* (June 9, 2020), https://www.kfvs12.com/2020/06/09/senator-discusses-covid-threat-federal-prisons/ (Senator Durbin spoke to Federal Public Defender officials about the failure of BOP to maintain safety for inmates and staff during the pandemic, noting that the BOP infection rate is seven times greater than that of the United States, while they have released only 2 percent of the BOP prison population.  Several BOP inmates who have died from the virus were within months of being released.); Brown.senate.gov, *Brown, Kaptur Demand Answers on Spread of COVID-19 at Elkton Prison Facility, Urge Bureau of Prisons to do More to Stop Spread of Virus, Protect Everyone There* (June 8, 2020), https://www.brown.senate.gov/newsroom/press/release/brown-kaptur-spread-covid-19-elkton-prison-facility (describing a letter sent by 4 Senators urging BOP to take immediate action.).

within the Bureau of Prisons; the rate of growth for which is twice that of the United States as a whole.[10]  Ms. Young asks this Court to consider the minimal amount of time left on her ten-year sentence, which was required by the mandatory minimum term under 21 U.S.C. § 841(b)(1)(A), and to grant her compassionate release and order her to serve the remainder of her sentence on home confinement, to spare her the risk of exposure to the virus.

## II.    Procedural Status

Ms. Young sent a letter to the Court on June 15, 2020, requesting compassionate release.  The Court appointed the Federal Public Defender to represent Ms. Young for this purpose and ordered an Amended Motion to be filed within three days.

Ms. Young filed a request for compassionate release with the Warden of her facility on April 9, 2020, and received a rejection letter on May 5, 2020.

## III.    Compassionate Release

President Trump signed the First Step Act into law on December 21, 2018.  Pub. L. No. 115-391 (Dec. 21, 2018).  Among

---

[10] *See infra* n. 12 (Table).

5

the changes in the law, Congress amended the provision on compassionate release at 18 U.S.C. § 3582(c)(1)(A)(i).  The law provides the sentencing judge with jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1(A); see also First Step Act of 2018, § 603(b), Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).  Prior to passage of the First Step Act only the Director of the Bureau of Prisons had the authority to file a motion for compassionate release.

This Court has discretion to reduce the term of imprisonment imposed in this case based on § 3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a

reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

## A. Exhaustion of administrative remedies

As noted above, normally the Court cannot consider a compassionate release motion filed by the defendant unless "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1(A).  Ms. Young has made a request to her Warden, which was denied more than 30 days ago. Therefore, she has met the statutory claim processing rule established by the First Step Act, as 30 days have lapsed since her request from the Warden at FCI Pekin.  Regardless, this Court has previously found that the immediate danger of serious illness or death from COVID-19 justifies excusing exhaustion of the compassionate release statute's administrative exhaustion requirement.  *See e.g.*, *United States v. Coles*, No. 00-CR-20051, 2020 WL 1976296 (C.D. Ill. Apr. 24, 2020).

7

**B.     COVID-19 provides an extraordinary and compelling reason for compassionate release.**

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction.  Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," (11th ed. 2019).  Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]."  *Id.*  The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes.  Thus, this Court is authorized to consider that the combination of circumstances provide extraordinary and compelling reasons for Ms. Young's immediate release.

　　　　　*1.     COVID-19 Is an Unprecedented and Rapidly-Expanding Global Health Emergency that Presents a Serious Risk to Vulnerable Populations.*

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as

a pandemic.[11]  "COVID-19 is a serious disease" that makes certain

populations of people severely ill and can lead to death.[12]  To be

certain, individuals need not fall within one of the at-risk categories

to experience complications, including death, from contracting the

virus.  The current best estimate is that the fatality rate among all

demographics "is 5-35 times the fatality associated with influenza

infection."[13]  COVID-19 has infected more than 9 million people

worldwide, leading to nearly 500,000 deaths.[14]  On March 26, 2020,

the United States became the global leader in COVID infections,

and have exceeded 2 million cases.[15]  The number of confirmed

COVID-19 cases continues to rise exponentially, but reported

---

[11] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020,* World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

[12] Declaration, Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶ 5 (Mar. 16, 2020), https://www.aclu-md.org/sites/default/files/field_documents/ex_d_-_beyrer_declaration_final.pdf.

[13] *Id.* at ¶11; *see also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

[14] *Coronavirus COVID-19 Global Cases*, Center for Systems Science and Engineering (CSSE) at Johns Hopkins University, https://coronavirus.jhu.edu/map.html (last visited June 15, 2020) (updating regularly).

[15] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, Business Insider (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3.

numbers underrepresent the true scope of the crisis—"experts believe that the United States still isn't testing enough people to detect the outbreak's true spread."[16]  Underreporting from a lack of testing is especially true within the BOP.  As the judge in *United States v. Caddo* noted, "it is unknowable whether BOP detainees or inmates have Covid-19 until they are tested, and BOP has not conducted many or any such tests because, like the rest of the country, BOP has very few or no actual Covid-19 test packets."  No. 3:18-cr-08341-JJT (D. Ariz. Mar. 23, 2020) (ECF No. 174) (Order at 5).

The alarming rise in the number of COVID-19 cases in the BOP shows the unique danger all inmates face from the virus.  The chart below shows the exponential growth in COVID-19 cases in the BOP to date.[17]

---

[16] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-amPierrens-are-sick-lost-february/608521/.

[17] Figures collected from www.bop.gov/coronavirus on a daily basis by the Federal Defenders of New York and posted to https://federaldefendersny.org/. "There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases.  *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020), https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of

| Date | Number of Positive Inmates | Number of Recovered Inmates | Number of Inmate Deaths | Number of Positive Staff | Number of Recovered Staff | Total BOP Cases |
|---|---|---|---|---|---|---|
| 3/19/2020 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3/23/2020 | 3 | 0 | 0 | 3 | 0 | 6 |
| 3/27/2020 | 6 | 0 | 0 | 3 | 0 | 9 |
| 3/31/2020 | 19 | 0 | 1 | 19 | 0 | 38 |
| 4/4/2020 | 75 | 0 | 6 | 39 | 0 | 114 |
| 4/8/2020 | 195 | 0 | 8 | 63 | 0 | 259 |
| 4/12/2020 | 318 | 15 | 9 | 163 | 8 | 481 |
| 4/16/2020 | 446 | 20 | 14 | 248 | 13 | 694 |
| 4/20/2020 | 479 | 145 | 21 | 305 | 26 | 784 |
| 4/24/2020 | 566 | 248 | 24 | 342 | 52 | 908 |
| 4/28/2020 | 799 | 385 | 27 | 319 | 124 | 1118 |
| 5/2/2020 | 1692 | 426 | 33 | 349 | 132 | 2041 |
| 5/6/2020 | 1984 | 543 | 40 | 356 | 149 | 2340 |
| 5/10/2020 | 3082 | 619 | 45 | 248 | 279 | 3330 |
| 5/14/2020 | 2817 | 1288 | 50 | 262 | 279 | 3079 |
| 5/18/2020 | 2280 | 1950 | 56 | 283 | 287 | 4856 |
| 5/22/2020 | 2267 | 2177 | 58 | 188 | 389 | 5079 |
| 5/26/2020 | 1558 | 3144 | 59 | 186 | 403 | 5350 |
| 5/30/2020 | 1577 | 3180 | 64 | 181 | 413 | 5415 |
| 6/3/2020 | 1649 | 3582 | 66 | 192 | 420 | 5909 |
| 6/7/2020 | 1956 | 3689 | 72 | 176 | 450 | 6343 |
| 6/11/2020 | 2125 | 3975 | 78 | 190 | 453 | 6822 |
| 6/15/2020 | 1374 | 4775 | 82 | 185 | 472 | 6889 |
| 6/19/2020 | 1318 | 4955 | 85 | 164 | 516 | 7039 |
| 6/23/2020 | 1349 | 4975 | 87 | 163 | 528 | 7103 |

It is important to note that at least one BOP inmate died of COVID-19 related complications after being deemed "recovered" and returned to the general population.[18]

---

Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn)."

[18] Inmate Adrian Solarzano was converted to recovered status on May 10, 2020, after being asymptomatic at FCI Terminal Island, and died 5 days later

Using only the numbers of currently infected inmates and staff, the growth rate for the virus within the BOP is astounding.  It dwarfs our national figures as demonstrated below,[19] demonstrating a very practical inability to contain the virus in BOP facilities.

| Date | Number of BOP Cases | BOP Rate of Rise | Cumulative BOP Rate of Rise Since 3/20/2020 | Number of National Cases | U.S. Rate of Rise | Cumulative U.S. Rate of Rise Since 3/20 |
|---|---|---|---|---|---|---|
| 3/20/2020 | 2 | 0.00% | 0.00% | 18,747 | 0.00% | 0.00% |
| 3/26/2020 | 18 | 200.00% | 400.00% | 85,356 | 93.19% | 228.87% |
| 4/1/2020 | 94 | 147.37% | 658.48% | 213144 | 51.27% | 345.21% |
| 4/7/2020 | 313 | 79.89% | 823.47% | 395011 | 29.59% | 417.81% |
| 4/13/2020 | 589 | 22.45% | 899.60% | 579,005 | 17.58% | 460.06% |
| 4/19/2020 | 804 | 6.91% | 934.19% | 746,625 | 12.83% | 487.17% |
| 4/25/2020 | 1047 | 7.16% | 962.87% | 928,619 | 12.09% | 510.23% |
| 5/1/2020 | 2876 | 29.84% | 1086.09% | 1,062,446 | 8.28% | 524.17% |
| 5/7/2020 | 3803 | 23.80% | 1116.70% | 1,219,066 | 5.79% | 538.42% |
| 5/13/2020 | 4772 | 4.83% | 1141.23% | 1,364,061 | 4.87% | 549.99% |
| 5/19/2020 | 5037 | 3.73% | 1146.72% | 1,504,830 | 4.05% | 560.06% |
| 5/25/2020 | 5348 | 1.13% | 1152.83% | 1,637,456 | 4.19% | 568.69% |
| 5/31/2020 | 5913 | 4.12% | 1163.14% | 1,761,503 | 3.71% | 576.13% |
| 6/6/2020 | 6539 | 3.09% | 1173.51% | 1,891,690 | 3.52% | 583.39% |
| 6/12/2020 | 6859 | .54% | 1178.38% | 2,036,429 | 3.30% | 590.90% |
| 6/18/2020 | 6986 | 1.39% | 1180.22% | 2,177,842 | 3.44% | 597.73% |

after having described chest pains.
https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf;
Richard Winton, *Inmate Labeled as 'Recovered' from Coronavirus Dies at Terminal Island* (May 28, 2020),
https://www.latimes.com/california/story/2020-05-28/ninth-inmate-dies-coronavirus-terminal-island-prison.
[19] National numbers collected by Federal Defenders of New York and posted at https://federaldefendersny.org/.  "Numbers obtained from https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html."

In other words, the curve of growth for confirmed coronavirus cases in the BOP far surpasses the rate for the United States as a whole, and keeps accelerating, depicting a very real and present danger to all BOP inmates and staff.[20]



Every BOP inmate is now, right now, at serious risk of contracting the virus whether the particular facility has yet to confirm cases or

---

20 https://federaldefendersny.org/.

not.  For any of these prisoners, contracting the virus very well may result in death.

Conditions of imprisonment create the ideal environment for the transmission of contagious diseases.[21]  "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."[22]  The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.[23]

According to health experts, incarcerated individuals "are at special risk of infection, given their living situations, "and "may also be less able to participate in proactive measures to keep themselves safe;"

---

[21] Joseph A. Bick, *Infection Control in Jails and Prisons* 1047-55, Clinical Infectious Diseases 45(8) (2007), at https://academic.oup.com/cid/article/45/8/1047/344842.
[22] Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[23] *Id.*

"infection control is challenging in these settings."[24]  Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons.[25]  Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content.[26]  Additionally, incarcerated people tend to be in poorer health than the general population.  According to a recent Bureau of Justice Statistics study, approximately half of state and federal prisoners and jail inmates have chronic conditions such as cancer, high blood pressure, diabetes, cirrhosis of the liver, heart

---

[24] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.

[25] Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[26] Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

disease, and asthma.[27]  Medical care of prisoners is limited at the

best of times.[28]

Because of these dangers, the public health community is

insistent on the critical need to rapidly reduce our prison

populations, both for the health of our inmates and the health of

the community as a whole:

> It is . . . an urgent priority in this time of national public health
> emergency to reduce the number of persons in detention as quickly
> as possible . . . Releasing as many inmates as possible is important
> to protect the health of inmates, the health of correctional facility
> staff, the health of health care workers at jails and other detention
> facilities, and the health of the community as a whole.[29]

---

[27] Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, Bureau of Justice Statistics, NCJ 248491, 1 (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[28] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, S*tatement from Federal Defenders of New York*, FEDERAL DEFENDERS OF NEW YORK (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.

[29] Beyrer, *supra* n.8 at ¶¶ 34, 36.

"We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID."[30]  On March 23, 2020, a bipartisan group of fourteen senators wrote to Attorney General Barr and the Director of the Bureau of Prisons to express "serious concern for the health and wellbeing" of those inmates "most vulnerable to infection."[31]  They noted that "[c]onditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease."  *Id.* The senators called on the BOP to use existing tools like the elderly prisoner home confinement program and compassionate release to discharge vulnerable inmates from prison. *Id.*

As of June 25, 2020, the BOP's COVID-19, Coronavirus webpage shows 1,249 inmates and 133 staff members with

---

[30] Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020) (quoting Rachael Bedard, Rikers Island Geriatrician), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus.

[31] Letter from Senator Charles Grassley et al. (Mar. 23, 2020), https://www.grassley.senate.gov/news/news-releases/durbin-grassley-colleagues-press-trump-administration-transfer-vulnerable-inmates.

confirmed cases of COVID-19.  https://www.bop.gov/coronavirus/.
And these are just the active infections.  Another 5.115 inmates and
571 staff members have been deemed recovered from the virus.  *Id.*

Because the danger of contracting COVID-19 in the BOP is
statistically profound and urgent, and because Ms. Young may
stand at high risk for contracting and experiencing serious
complications from the disease, this Court may, in its discretion,
determine that the combination of factors present an extraordinary
and compelling basis for s sentence reduction in this case.

    3.    *Ms. Young Runs a High Risk of Serious Illness or
Death if She Contracts COVID-19.*

The CDC and other medical authorities have made clear that
COVID-19 is especially dangerous for people of all ages with
underlying medical conditions.[32]  Those with certain serious health
concerns—including heart failure and stroke—are also especially
vulnerable to and at higher risk for serious complications from
COVID-19, including death.[33]  Ms. Young's medical records reflect a

---

[32] *See* CDC, *People Who are at Higher Risk*,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.
[33] *See* CDC, *Information for Healthcare Professionals: COVID-19 and Underlying
Conditions* (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

history of blood clots that have required various blood thinning medications to reduce her risk of stroke. She also suffered a heart attack in 2013. Combined with her age, there is a significant risk that, if she contracts the virus, she will not survive and will instead become memorialized in a single one-page press release as yet another BOP casualty.

While Ms. Young is among those at-risk of death or serious illness from COVID-19, as a Bureau of Prisons inmate, it is impossible for her to follow the CDC's recommendations to protect herself from exposure to this highly-transmissible disease.[34] Ms. Young's risk of serious illness or death from the unprecedented global pandemic, together with all of the other relevant factors in this case, presents an extraordinary and compelling basis for sentence reduction.

---

conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions.

[34] *See* The New York Times, *Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars* (Apr. 9, 2020) (Measures taken by jail administrators "have not prevented a dizzying pace of infection among a population in which social distancing is virtually impossible and access to soap and water is not guaranteed."), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

**D. With Full Consideration of the § 3553(a) Factors, Including the COVID-19 Pandemic, Ms. Young's Time Served, in Addition to a Period of Home Confinement. Constitutes a Sentence Sufficient, but Not Greater than Necessary, to Accomplish the Goals of Sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).  Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).  Ms. Young has had no disciplinary infractions since arriving at the BOP for the service of this sentence.  She has completed 372 GED education hours in addition to other courses.

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents.  Although the circumstances of the present offense qualified Ms. Young for the sentence of imprisonment that this Court imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness.  In fact, the Eighth

Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody.  *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions).

The totality of the circumstances demonstrate that reducing Ms. Young's sentence to time served to be followed by a term of home confinement as a condition of supervised release, may be considered "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).  Ms. Young proposes that she will live with her daughter Ranika Young in Springfield, Illinois. There, she will have every reason to self-quarantine and protect both her health and that of her family.

WHEREFORE, the defendant respectfully requests that this Honorable Court grant her compassionate release.

Date: June 25, 2020                Respectfully submitted,

                                   BELINDA YOUNG, Defendant

21

By: s/ *Rosana E. Brown*
Rosana E. Brown
Assistant Federal Public Defender
Office of the Federal Public Defender
600 E. Adams, 3rd Floor
Springfield, Illinois 62701
Telephone: (217) 492-5070
Fax: (217) 492-5077
E-mail: rosie_brown@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the United States Attorney's Office.  I also certify I have mailed the foregoing document by First Class Mail within three calendar days to the non-CM/ECF participant: Mr. Belinda Young.

By: s/ *Rosana E. Brown*
Rosana E. Brown
Assistant Federal Public Defender
Office of the Federal Public Defender
600 E. Adams, 3rd Floor
Springfield, Illinois 62701
Telephone: (217) 492-5070
Fax: (217) 492-5077
E-mail: rosie_brown@fd.org